Keating, J. (dissenting).
The majority, content simply to proffer a truncated analysis of the issue we are called upon to review, places sole reliance on a misplaced emphasis on section 227 of the New York City Charter. The majority has failed to consider the proper sequential relationship between sections 227 and 228 with respect to budget appropriations, initial site selection and final approval of locations.
This article 78 proceeding was instituted by 69' homeowners and several businesses located in the Corona section of Queens. The petitioners’ homes and businesses were to be taken by the city in order to construct a schqol and athletic field. The proposed site for the school was located only two blocks from a large vacant lot which, according to these property owners, would have served the needs of the Board of Education as well as the site selected. The article 78 proceeding, however, was not premised on the illogical choice of the site selected but rather on the failure of the city to comply with the applicable procedure set forth in the City Charter for the purpose of selecting and approving sites for capital projects.
The New York City Charter provides that indebtedness may not be contracted for a capital project unless an appropriation for the project appears in the Capital Budget of the city (Charter, § 225). Before a project becomes part of the budget public hearings are held. The budget is then adopted by April 20 of each year (§§ 216, 217, 219, 221, 222, 223).
The hearing held before the Board of Estimate serves the function of formulating the budget as a fiscal planning device. At the time the budget is proposed it is composed of hundreds of items which the city needs. Many of these projects are only in the planning stage and, therefore, can only be generally *192 described as to project and cost. Of course, no specific site designation can ibe established for the project at this time. Thus, for example, in this case, the high school in dispute was a general budget item with its site location specified as “ location undetermined”. Accordingly, none of the affected residents of this Queens community would have been on notice to protest the school location to the Board of Estimate. The hearings held before the Board of Estimate at this time are to assist the board in reaching a realistic view of the capital improvements needed by the city and establish priorities for these projects in light of the fiscal resources available to the city.
Under the new Charter, the Capital Budget has thus become an appropriating document. The decision of the board to adopt the proposed budget is based primarily on financial considerations. But it is clear that not every project approved and included in the adopted budget will actually be built. Therefore, at the time the budget is adopted, almost no consideration is given to particular site locations for the proposed projects.
The budget, after it is approved, is a framework by which the Mayor, as chief executive of the city, has the sole prerogative to determine which projects should be initiated and when. Thus, until the Mayor’s decision to initiate a project, there is no reason to search for a location to place it. When the Mayor determines that an approved project should go ahead, he notifies the Site Selection Board and directs that body to select a site. This board is made up of three mayoral designees and two elected city officials. The Site Selection Board then holds public hearings to determine where the capital project should be located. Its selection is then sent to the Mayor. The dispute in this case involves what is to transpire from this point.
The petitioners contend that the City Charter provides that the Board of Estimate must hold a public hearing and pass upon the proposed site on which the Mayor intends to initiate construction. The city argues that, after the site is selected, the Mayor need only direct the Corporation Counsel to institute legal proceedings to take the property. We agree with the petitioners.
It is obvious from reviewing the budget and site selection process provided for in the City Charter that the city’s contention, which is sanctioned by the majority, in effect insulates *193 the elected representatives of the City of New York from passing upon sites selected for capital projects. The majority not only deprives these elected officials of a decision which is rightfully theirs but, in addition, deprives the citizens of New York City of the opportunity to petition their representatives about specific site locations. We do not believe that the new Charter provisions were intended, or should be read, to insulate elected officials from one of the attributes of representative government.
It is apparent from reading sections 227 and 228, studying their legislative history and reviewing the historical way in which capital project site locations have been determined in New York City that the majority’s analysis is incorrect.
It is clear, when the budget process is understood, that the term “project initiation ”, referred to in section '228, does not refer to placing a proposed1 project in the budget, as the majority believes, but rather refers to the discretion afforded the Mayor in deciding which projects to start and their presentation to the Board of Estimate as a concrete program of development. It was "never intended that a nebulous conception of a capital project, for which the board was only initially asked to set aside possible funds, should bind them in the future so that, if the Mayor desires to initiate a project, they lose the authority to disapprove the -final plan. We think that the requiremént expressed in section 228 that before any property be taken, the Board of Estimate must pass on the project, is not mere surplusage but reinforces our position. In order to give these sections vitality and consistency, we cannot hold that the initial budget hearing, which was concerned primarily with financial matters, is the hearing contemplated by section 228 to be held by the board before specific property is condemned.
This analysis is consistent with the reviser’s notes for the New York 'City Charter. In the Final Report of the Charter Revision Commission of the City of New York, the revisers entered these remarks with respect to the procedures being scrutinized: “There will be a public hearing of every project in the Capital Budget before the Mayor- may direct that it be initiated. Thus, the Capital Budget will become an appropriating document, but there will also be a ‘ second look ’ at each project before the -City finally.commits itself.”
*194 The law has always provided in New York City that no site selected for condemnation could be actually acquired by the city until first the specific land and property involved has been passed upon by the Board of Estimate. (Ash, Greater New York Charter With Appendixes, Ann. [4th ed., 1918], § 1483; see, also, Levey and Manheimer, Condemnation in New York, 293-294.) This requirement was not changed by the new Charter. The new Charter simply sought to relieve the Board of Estimate from the herculean task of routine site selection.
Under the City Charter in effect prior to January 1, 1963, site selection for capital projects was a regular function of the Board of Estimate. Section 384 (subd. [a]) of the old Charter provided: “No real property and no interest thereon may be acquired by the city, arid no real property of the city may be sold, leased, exchanged or otherwise disposed of except with the approval of the board of estimate ”. Thus, until January 1, 1963, the Board of Estimate not only was required to approve all capital projects for inclusion in the budget, but, in addition, had the task of conducting public hearings to select particular locations for capital projects. The selection of each site was too time -consuming a task for the Board of Estimate. It was clearly evident that a more administratively realistic alternative had to be devised.
Therefore, the Charter Revision Commission proposed this bifurcated approach, whereby routine site selection and narrowing down of locations would be the function of the -Site Selection Board, and the Board of Estimate would then only have to pass upon their recommendation. This procedure was more efficient for the Board of Estimate for oftentimes site locations are noncontroversial and, in those cases where persons seek to be heard, the burden on the board is lighter because, the proposed site is already fixed. Thus, under the new Charter, the Board of Estimate has more, time to fulfill its principal budgetary function while still serving its historical function of holding a last hearing before property is" condemned, disposed of or sold. It is clear, therefore, that the final judgment concerning project location is to be reviewed by the Board of Estimate.
After the budget was approved by the Board of Estimate, but before the Site Selection Board had an opportunity to choose *195 a specific location for the proposed new Queens’ school, a public hearing was held before the ¡board. The majority point to this hearing as the “ second look ” referred to by the revisers. This hearing, however, was held on July 8, 1966 approximately one year before the Site 'Selection Board chose a specific site for the school, for the ostensible purpose of permitting opponents and proponents of the proposed school an opportunity to air their views. No one appeared at the scheduled hearing either in favor of or opposition to the proposal. The obvious reason for this lack of interest was that the published notice only indicated that the board would consider the construction of a new school to be built somewhere in Queens. It is hard to imagine any vocal opposition to a school at an unspecified location from members of a large community which desperately needed more educational facilities.
Section 288 specifically provides that the Mayor may only initiate construction of a project after a public hearing has been held before the Board of Estimate. The City Charter does not permit the reading that the Site Selection Board Is authorized to select a site between the time the Board of Estimate holds its final public hearing and the Mayor directs that construction be started. The meeting held on July 8, 1966 before the Board of Estimate was not the required hearing specified by the City Charter. This meeting, therefore, Is not a valid substitute for the hearing required by section 228 before the Mayor may institute construction of a capital project.
We do not believe that this reading of sections 228 and 227 in any way wipes off the books the provision that the Site Selection Board shall select the particular site for capital projects. The Board of Estimate only has the authority to approve or disapprove of the selection made after its hearing. This analysis places the events specified in the sections under review in their proper sequential order.
Since the city in this case failed to follow the procedures set forth in the City Charter, the petitioners’ properties cannot be condemned. This is not to say that the Mayor cannot cause a public hearing to be held before the Board of Estimate in the future concerning the recommendation of the Site Selection Board that this particular location be used for a school.
*196 Accordingly, the order of the Appellate Division should be reversed.
Chief Judge Fuld and Judges Breitel and Jasen concur with Judge Bergan; Judge Keating dissents and votes to reverse in a separate opinion in which Judges Burke and Soileppi concur.
Order affirmed.